## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,
                    Plaintiff,

v.                                                  **No.** CR 09-863 MCA

**MARK E. HOPKINS, and**
**SHARON J. HOPKINS,**
                    Defendants.


## MEMORANDUM OPINION AND ORDER

     **THIS MATTER** is before the Court on the following motions:  *Government's Motions in Limine* [Doc 42 & Doc 143]; *Defendants' Motion In Limine* [Doc 43]; Defendant Sharon Hopkins's *Motion To Dismiss And Strike Count 2 As It Pertains To Sharon Hopkins* [Doc 140]; *Government's Motion In Limine To Exclude The Testimony Of Joseph R. Banister* [Doc 142]; *Defendants' Motion In Limine* [Doc 146]; Defendant Sharon Hopkins's *Motion To Limit Trial Hours* [Doc 148]; Defendants' *Joint Daubert Motion/Motion In Limine To Preclude Sandra Villareal As Expert* [Doc 153]; Defendants' *Joint Motion To Strike Surplusage* [Doc 158]; Defendants' *Motion In Limine To Preclude Summary Witness Testimony And Evidence* [Doc 160]; *Government's Motion In Limine To Admit, Subject To A Determination Of Relevance, Domestic Bank Records And Other Business Records* [Doc 130].  The Court convened the Call of the Calendar on September 20, 2010, in order to address these motions, and each *Motion* is addressed in turn.

I.      ANALYSIS

A.      Government's Motions in Limine [Doc 42 & Doc 143]

The Government's initial motion in limine seeks to exclude or limit three

categories of evidence.  First, the Government contends that any tax protestor literature

that is admitted into evidence should be restricted to only those materials on which

Defendants actually relied and which will not confuse the jury.  [Id. at 2-]  Second, the

Government seeks to prevent Defendants from testifying regarding the constitutionality or

validity of tax laws.  [Id. at 6-7]  Third, the Government argues that Defendants should be

permitted to testify about information that they received from third parties or about

statements that they made to third parties only insofar as those communications affected

their state of mind.  [Id. at 8-10]  The Government's supplemental motion in limine is

presented in order to limit the Defendants' use of certain IRS records that were disclosed

to Defendants during discovery.  [Doc 143]

1.      "Tax Protestor" Literature

Regarding the tax protestor literature and legal documents, the Government's

argument is two-fold.  The Government contends that Defendants must lay an adequate

foundation in order to introduce such materials and also that the Court must conduct the

Fed. R. Evid. 403 balancing test so as to avoid juror confusion.  It is permissible for

Defendant to offer exhibits to establish a "good faith belief that he has no legal obligation

to file and evidence showing the reasonableness of that state of mind. . . ."  United States

v. Willie, 941 F.2d 1384, 1392 (10th Cir. 1991).  Defendant may not, however, attempt to

prove that he reasonably believed that "he *should* not have a duty."  Id. (emphasis added).

Our Tenth Circuit Court of Appeals has explained that

> the precise purpose for which the evidence is offered becomes crucial to the
> trial court's determination of admissibility, particularly in cases of this
> nature where the careless admission of evidence supporting both relevant
> and irrelevant types of belief could easily obfuscate the relevant issue and
> tempt the jury to speculate that the mere existence of documentary support
> for the defendant's position negates his independent knowledge that he has
> a legal duty.

Id. at1393. Thus, Defendants must "persuasively show the trial judge that the evidence is

being offered for a permissible purpose by making a proffer of great specificity regarding

the type of belief he seeks to prove.  Id.

The Willie Court "alternatively" held that tax protestor literature and legal

documents are properly excluded "under Fed.R.Evid. 403 because they were confusing,

because the danger of the jury's misuse of the evidence for an improper purpose was

great, and because the relevant point was provable by other evidence."  Willie, 941 F.2d

at 1395.  Specifically, the Court deferred to the district court's "implicit determination

that the legal documents inappropriately argue the law and tended to make a mockery of

th[e] courtroom. . . ."  Id. at 1396 (alteration in original) (internal quotation marks and

citation omitted).

Defendants argue that they intend to offer materials to show that they believed

"that they were not persons liable for the income tax and thus were not required either to

file income tax returns or pay income taxes. . . ."  [Doc 168 at 2]  Defendants' primary

position is as follows:  "To prevent [D]efendants from actually proving what a document

states—what the government itself has represented in documents it has

authored—constitutes an unconstitutional abridgment of [D]efendants' right to present a

complete defense."  [Id. at 3]  To that end, Defendants cite authority to support the

Constitution's guarantee that criminal defendants enjoy the right to "a meaningful

opportunity to present a complete defense."  [Id. quoting Holmes v. South Carolina, 547

U.S. 319, 324 (2006) (considering whether a blanket rule disallowing evidence of third-

party guilt when the prosecution presents forensic evidence).]  Apart from Holmes, the

remainder of the cases cited by Defendants either do not stand for the proposition cited or

are factually distinct.  See e.g. Kittelson v. Dretke, 426 F.3d 306, 322-23 (5th Cir. 2005)

(granting habeas relief because the case turned entirely on the credibility of the

complaining witness, and the state courts' restriction on the defendant's ability to

challenge that credibility violated clearly-established rights to confrontation and due

process); Taylor v. Withrow, 288 F.3d 846, 851, 853 (6th Cir. 2002) (observing that "

defendant in a criminal trial has the right to "a meaningful opportunity to present a

complete defense" and nevertheless holding that this rule "does not give a defendant the

right to offer any defense, nor to demand a jury be instructed on any theory"); United

States v. Fooladi, 746 F.2d 1027, 1031 (5th Cir. 1984) (affirming the district court's

refusal to give a specific good-faith defense instruction); Tarpley v. Estelle, 703 F.3d 157,

159 (5th Cir. 1983) (evaluating jury instructions on a petition for habeas corpus to

determine whether the defendant could have been convicted for an uncharged crime).

Defendants further contend that there is a "valid defense of reliance on government representations."  [Id. at 3]  In the cases cited by Defendants, however, the defendants attempted to provide evidence that a specific government agency or individual had either specifically approved of the conduct that was eventually criminally charged or that the agency had a history of approving similar conduct.  See United States v. Pa. Indus. Corp., 411 U.S. 655, 673, 675 (1973) (reversing the decision of the district court to exclude evidence that an administrative agency had previously construed its own regulations in a manner that permitted the charged conduct); United States v. Laub, 385 U.S. 475, 487 (1967) ("Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach."); Cox v. Louisiana, 379 U.S. 559, 570-71 (1965) (holding that demonstrators could not be convicted for disturbing the peace because those demonstrators were told by police that they could protest in particular location and the demonstrators followed those instructions);  Raley v. Ohio, 360 U.S. 423, 424-26 (1959) (holding that a state supreme court could not revoke a privilege that the state had promised was available to the defendant); Arizona Grocery Co. v. Atchison, T & S.F. Ry. Co., 284 U.S. 370, 389 (1932) (holding that a carrier could rely on the declaration of a government agency as to what is a "lawful . . . reasonable rate" for railway shipments); United States v. Levin, 973 F2d 463,  (6th Cir. 1992) ((quoting Laub, 385 U.S. at 487)); United States v. Clegg, 846 F.2d 1221, 1224 (9th Cir. 1988) (holding that a charged arms dealer was "entitled to rely upon the representations of" government officials that his actions were legal); United States v.

Tallmadge, 829 F.2d 767, 773 (9th Cir. 1987) (describing the defense of "entrapment by estoppel" to apply when "an official tells the defendant that certain conduct is legal and the defendant believes the official"); United States v. Hedges, 912 F.2d 1397, 1405 (11th Cir. 1990) (addressing the defendant's "reliance on a public officer's advice raising an entrapment by estoppel defense").  There is no evidence or argument in the present case that Defendants relied on the representations of a public officer in order to determine that their actions were legal.  Nor has the Government recently changed its legal position with regard to Defendants, as was the circumstance in United States v. GAF Corp., 928 F.2d 1253 (2nd Cir. 1991), another case cited by Defendants.  Id. at 1260 ("Although the government is not bound by what it previously has claimed its proof will show any more than a party which amends its complaint is bound by its prior claims, the jury is at least entitled to know that the government at one time believed, and stated, that its proof established something different from what it currently claims.").

Given Defendants' intended use of the materials, Defendants may refer to having reviewed the materials which caused them to form their beliefs.  They will not be permitted to send the materials back with the jury.  In this manner, Defendants may demonstrate that they relied on certain documents and publications, but the jury will not be confused about the law—the only law that the jury will have for its consideration will be this Court's final instructions.

## 2.     Tax Law Validity

Next, the Government contends that "Defendants should be precluded from

presenting evidence or argument concerning the constitutionality or validity of the tax

laws."  [Doc 42 at 7]  The Supreme Court of the United States has held that "in a case like

this, a defendant's views about the validity of the tax statutes are irrelevant to the issue of

willfulness and need not be heard by the jury, and, if they are, an instruction to disregard

them would be proper."  Cheek v. United States, 498 U.S. 192, 206 (1991).  This is

because "[c]laims that some of the provisions of the tax code are unconstitutional . . . do

not arise from innocent mistakes caused by the complexity of the Internal Revenue Code,

[but r]ather, they reveal full knowledge of the provisions at issue and a studied

conclusion, however wrong, that those provisions are invalid and unenforceable."  Id. at

205 (internal footnote omitted).

With regard to Defendants' opinions about the validity of the law, it is also to be

noted that "[t]he law is given to the jury by the court and not introduced as evidence. . . .

Obviously, it would be most confusing to a jury to have legal material introduced as

evidence and then argued as to what the law is or ought to be."  Id. at 1396 (internal

quotation marks and citation omitted).  Defendants shall not have the opportunity to

instruct the jury with their version of the law.  "The law is the singular province of the

judge."  Id.

**3.**     **Self-Serving and State of Mind Evidence**

The Government's final point in this *Motion* is that Defendants should not be able

to testify (1) about information that they received at tax seminars or (2) about statements

that they made to third parties regarding information that they received from tax advisors.

[Id. at 8-9]  Both types of statements, the Government contends, are hearsay and not admissible.  [Id. at 8]  The Government states that Defendants may only offer such hearsay testimony in order to show "the effect that these seminars and other meetings had on their state of mind."  [Id.]  See Fed. R. Evid. 803(3) (explaining that the following statements are not excluded under the hearsay rule:  "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will").

Our Tenth Circuit Court of Appeals has not addressed the admissibility of advice that a defendant received at a tax seminar—specifically, the Court has not determined whether such hearsay is admissible to demonstrate the "willfulness" element of the charged crime.  The Fifth Circuit Court of Appeals, however, addressed the issue and determined that the district court did not improperly limit the defendant's testimony by permitting statements "for the limited purpose of showing that such statements were made and the effect they had on [the defendant's] beliefs."  United States v. Barnett, 945 F.2d 1296, 1302 (5th Cir. 1991).  The Ninth Circuit Court of Appeals considered a similar issue and explained that "[t]he defendant is entitled to testify about the tax advice he received—subject, of course, to cross-examination—and exclusion of this testimony is error."  United States v. Moran, 493 F.3d 1002, 1013 (9th Cir. 2007).  Such testimony regarding advice is not hearsay, the Moran Court concluded, because it is not offered to

establish the truth of the matter asserted.  Id.; see also United States v. Wellendorf, 574

F.2d 1289, 1290 (5th Cir. 1978) (holding that testimony about advice received at a tax

protestor meeting was improperly excluded as hearsay because "it was offered for proof

of [the defendant's] intent and not for the truth of the statement.").

These cases are in line with the rules of evidence.  An out of court statement is not

hearsay unless it is "offered in evidence to prove the truth of the matter asserted."  Fed. R.

Evid. 801(c).  Any testimony by Defendants relating to what they heard at a tax seminar

is not hearsay if it is not offered to demonstrate that what was said at the tax seminar is

the state of our nation's tax law—or the "truth" of the matter asserted.  Instead,

Defendants can testify about what was said at the seminar to show that they received the

information and then that they acted on that information or that they relied on that

information.

## 4.      IRS Computer Records

During discovery, Mrs. Hopkins's former counsel, Mr. Altman, requested certain

internal IRS data from the Government.  Much of this data, according to the Government,

is not available to a requesting taxpayer.  Although the Government provided the data to

Defendants, it now requests that its use be limited either for impeachment purposes or in

the event that Defendants can establish that they relied on the information to form their

opinions.  [Doc 143 at 2]  Defendants have agreed to this limited use and proffered at the

Call of the Calendar that the IRS record—exhibit M:AO—will be used only for

impeachment purposes.

**5.**     **Summary**

These *Motions* are granted in part and denied in part.  No tax protestor literature or excerpts of legal documents will be admitted into evidence, and Defendants may not testify regarding the constitutionality or validity of the tax laws.  To the extent that third-party statements are elicited to demonstrate Defendants' state of mind, and not for the truth of the matter asserted, the statements will not be excluded on hearsay grounds.  The IRS record addressed in the Government's *Supplemental Motion* may be used as agreed by the parties, for impeachment purposes.

**B.**     **Improper Appeal to Juror Emotions [Doc 43]**

Defendants requested  that the Court require the Government to refrain "from making statements or arguments in the presence of the jury that, directly or indirectly, appeal to the jury's prejudices, emotions or pecuniary interests."  [Id. at 1]  By way of example, Defendants anticipated that the Government may refer to Defendants as "tax protestors," pose rhetorical questions such as "What would happen to this country if everyone refused to properly file and/or pay their income tax?," or comment on Defendants' alleged failure to "pay their 'fair share' of taxes."  [Id. at 5]  In addition, Defendants were concerned that the Government would appeal to the jury's pecuniary interest by "implying that Defendants are a member of a class of persons which costs them money by causing their taxes to be higher."  [Id.]

At the Call of the Calendar, Defendants withdrew their *Motion*, stating that they were not concerned about the Government's behavior in this regard.  The parties

acknowledged their duty to conduct themselves professionally and properly, and the Court is satisfied that the parties understand their obligations.

**C.**     **Motion to Dismiss and Strike Count 2 [Doc 140]**

Sharon Hopkins challenges the sufficiency of the Indictment as to Count 2.  [Id.] She claims that the crime charged in Count 2 has a six-year statute of limitations, that the six-year period expired in 2003, and that the Government has failed to allege any "evasive affirmative act that would extend the statute of limitations to the date of the Indictment."  [Id. at 3]  The Government contends that Defendants' actions have tolled the statute of limitations and that the Indictment alleges facts to support a continuing "course of conduct" between 1996 and 2001.  [Doc 164 at 2, 3]

"An indictment should be tested solely on the basis of the allegations made on its face, and such allegations are to be taken as true."  United States v. Welch, 327 F.3d 1081, 1090 (10th Cir. 2003) (internal quotation marks and citation omitted).  As a result, "[w]here a defendant challenges the sufficiency of an indictment for failure to state an offense, a court generally is bound by the factual allegations contained within the four corners of the indictment."  Id. at 1089-90.  Turning to the Indictment, in Count 2, Sharon Hopkins is charged as follows:

> From in or about 1996 up to an including the date of this indictment, in the District of New Mexico, the defendants, MARK E. HOPKINS and SHARON J. HOPKINS, did willfully attempt to evade and defeat payment of a large part of the income tax due and owing by them to the United States of America for the tax years set forth below and in the amounts set forth below, by among other things, using nominees to conceal their income,

bank accounts, and ownership of assets.

[Doc 1 at 8]  The Indictment continues to allege that for tax years 1996 and 1997, Sharon

Hopkins was assessed to owe $20,523 and $29,015, respectively.  [Id.]  At the time of the

Indictment, Sharon Hopkins was alleged to owe $67, 586 and $47,818, including interest

and penalties, for 1996 and 1997.  [Id.]  These acts are alleged to be in violation of 26

U.S.C. § 7201.  [Id.]  In addition, Count 2 incorporates the preceding paragraphs 1

through 6 and 14 through 36, which proffer introductory facts and outline the specific

actions taken by Defendants.  [Id. at 8, 1-6; 4-7]

      26 U.S.C. § 7201 makes it a felony to willfully attempt "in any manner to evade or

defeat any tax imposed by this title or the payment thereof."  Pursuant to 26 U.S.C. §

6531(2),

> No person shall be prosecuted, tried, or punished for any of the various
> offenses arising under the internal revenue laws unless the indictment is
> found or the information instituted within 3 years next after the commission
> of the offense, except that the period of limitation shall be 6 years . . . (2)
> for the offense of willfully attempting in any manner to evade or defeat any
> tax or the payment thereof. . . .

Our Circuit has adopted the rule that "when a defendant commits a series of evasive acts

over several years after incurring a tax liability, the statute of limitations begins to run on

the date of the last evasive act."  United States v. Thompson, 518 F.3d 832, 856 (10th Cir.

2008) (internal quotation marks and citation omitted).  This is because

> Section 7201 criminalizes not just the failure to file a return or the filing of
> a false return, but the willful attempt to evade taxes in any manner. In light

> of the fact that evasive acts following the filing of a return may be
> considered part of the offense, . . . it is the date of the latest act of evasion,
> not the due date of the taxes, that triggers the statute of limitations.

Id. (internal quotation marks and citation omitted).  The hold otherwise, the Circuit noted,

"would only reward a defendant for successfully evading discovery of his tax fraud for a

period of six years subsequent to the date the returns were filed."  Id. (internal quotation

marks and citation omitted).  Thus, the limitations period did not necessarily expire on

April 15, 2003 and April 15, 2004, as Sharon Hopkins argues.  Instead, the Court

considers the Indictment to determine whether the Government has alleged that Sharon

Hopkins committed "a series of evasive acts" that would trigger the running of the statute

of limitations.  See id.

    "An affirmative act of evasion "requires more than the passive failure to file a tax

return; rather, it requires a positive act of commission designed to mislead or conceal."

Id. (internal quotation marks and citation omitted).  The Indictment alleges—in

paragraphs that were incorporated into Count 2—that Sharon Hopkins opened a bank

account at Wells Fargo in the name of House of Royale in January 2004 and that she filed

articles of incorporation for House of Royale on December 29, 2006.  [Doc 1 at 7]  The

Indictment further alleges that Sharon Hopkins "created a number of entities that the

couple used to conceal their assets including . . . House of Royale, Inc. . . . whose only

officer was Sharon J. Hopkins."  [Id. at 2]  These dates are well within six years of the

filing of the Indictment, on April 9, 2009.  [Id. at 1]  Based on these charged acts, the

Government has sufficiently alleged that Sharon Hopkins took "affirmative act[s] of

evasion . . .designed to mislead or conceal" within the requisite time period.

Accordingly, the *Motion To Dismiss And Strike Count 2 As It Pertains To Sharon*

*Hopkins* [Doc 140] is denied.

**D.**     **Motion to Exclude the Testimony of Joe Banister [Doc 142]**

Rule 702 imposes a special gatekeeping obligation on this Court to ensure that

expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho

Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993).  The relevance of such testimony

also must be weighed against "the danger of unfair prejudice, confusion of the issues, or

misleading the jury" as well as "considerations of undue delay, waste of time, or needless

presentation of cumulative evidence." Fed. R. Evid. 403.  While the Court is not required

to consider any particular set of factors or utilize a particular procedure in making such

determinations with respect to expert testimony, the Court must make *some* kind of

determination on the record in order to demonstrate that it has performed its gatekeeping

function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v.

Denver and Rio Grande Western R. Co., 346 F.3d 987, 991-92 (10th Cir. 2003).

Rule 702 was amended in 2000 to state as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied

the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The first requirement of this rule is that the expert's specialized

knowledge must "assist the trier of fact."  Id.  "Rule 702 thus dictates a common-sense

inquiry of whether a juror would be able to understand the evidence without specialized

knowledge concerning the subject."  United States v. Muldrow, 19 F.3d 1332, 1338 (10th

Cir. 1994).  The Supreme Court of the United States has explained that "[e]xpert

testimony which does not relate to any issue in the case is not relevant and, ergo,

non-helpful" to the jury.  Daubert, 509 U.S. at 591 (internal quotation marks and citation

omitted).  In order to determine whether evidence is "helpful," the proponent must

establish a "valid scientific connection to the pertinent inquiry."  Id. at 591-92.  The

question, according to the Daubert Court, is "one of fit."  Id. at 591 (internal quotation

marks and citation omitted).  Fitness, the Court observes, is "not always obvious" because

"scientific validity for one purpose is not necessarily scientific validity for other,

unrelated purposes."  Id.

The Government has filed a motion in limine pursuant to Rule 702, seeking to

prevent Defendants' proposed expert, Joe Banister, from testifying.  [See id.]  The parties

do not appear to dispute Mr. Banister's qualifications, or even his methodology.  Instead,

the debate focuses on the relevance of Mr. Banister's opinions to the issues at trial.

Defendants' contend that Mr. Banister's testimony is relevant because the tax laws are

confusing to most people and his understanding and experience will aid the jury.

Defendants maintain the following:

> Mr. Banister's testimony is based on his unique and specialized expertise from the perspective of an IRS investigator, the perspective of an IRS Special Agent, the perspective of a citizen in conflict with the IRS, and the perspective of a citizen accused of criminal violations of the tax laws and ultimately acquitted of those charges. He is perhaps the sole person in the Country with the above described experience who can give intelligent and meaningful testimony into both the intricacies of the Internal Revenue Code, the federal income tax system, the IRS, the criminal offenses of tax evasion and their correlation with the Hopkins defendants.

[Doc 169 at 1-2] After this statement, Defendants' response is largely devoted to establishing to a legal certainty that the tax code is complex and that most people do not understand the laws. In closing, Defendants argue that

> The fact of the matter is that Mr. Banister possesses the 'actual knowledge' described and required in <u>Daubert</u> . . . . Mr. Banister was trained as an IRS Special Agent by the IRS to gather evidence and perform analysis regarding the existence or absence of willfulness with regard to tax investigations. Mr. Banister's investigative work while he served as an IRS Special Agent dealt specifically with investigative inquiries into allegedly false income tax returns and tax evasion with the IRS. Mr. Banister not only prepared three amended tax returns in a similar manner as the defendants, he was also investigated by the IRS criminal division, indicted, prosecuted and ultimately acquitted for do so.

[<u>Id.</u> at 5] The Government takes the position that Mr. Banister can bring no "special expertise" to the issues on the table because the question before the jury is willfulness—whether Defendants had a good-faith belief that they were acting within the law, regardless of the reasonableness of that belief. [Doc 142 at 3] Instead, the Government argues, "Defendants are free to testify about their beliefs and how they formed them." [<u>Id.</u>]

In order to ascertain the scope of the issues in the case and thus, to determine relevancy, the Court turns again to the Indictment.  In Count 1, Defendants are charged with conspiring to impair, obstruct, and defeat the "lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of the revenue. . . ." [Doc 1 at 3]  In Count 2 and Counts 3 through 8, Defendants are charged with wilfully attempting to evade and defeat the payment of the income tax due and owing by them for the listed tax years.  [Id. at 9]  In order to prove the evasion charges, the Government must show the following:  "1) the existence of a substantial tax liability, 2) willfulness, and 3) an affirmative act constituting evasion or attempted evasion."  United States v. Mounkes, 204 F.3d 1024, 1028 (10th Cir. 2000).  The Defendants acted "willfully" if the Government can demonstrate that "the law imposed a duty on [them], that [they] knew of this duty, and that [they] voluntarily and intentionally violated that duty."  Cheek, 498 U.S. at 201.  Thus, in their defense, Defendants may assert that they truly believed they had no duty under the Internal Revenue Code—no matter how "unreasonable a court might deem such a belief"—and the jury is entitled to credit Defendants' testimony.  Id. at 202.

Defendants' proffer of Mr. Banister's testimony indicates that he will testify about his experiences as an IRS Criminal Investigation Division (CID) Agent, about his personal inquiry into the federal income tax system, about his resignation from the IRS-CID, about his media appearances, about the civil complaint filed against him by the IRS, about his subsequent indictment and acquittal for false income tax preparation and fraud,

about his conclusions regarding the method used by IRS for targeted prosecutions, about the reasonableness of Defendants' tax-related beliefs, and about how an IRS-CID agent would evaluate and investigate the Defendants' circumstances.  [See Doc 170-1]  All but the last two topics are relevant only to establish foundation for Mr. Banister's opinions. With regard to the second-to-last subject, Mr. Banister will not be permitted to testify regarding the reasonableness of Defendants' tax-related beliefs.  The jury is required to evaluate the sincerity of Defendants' beliefs regarding the tax code and thus, whether Defendants' acted wilfully.  As Defendants are not required to establish a *reasonable* belief—merely a *sincere* belief—Mr. Banister's testimony on this topic will not help the jury.  See Cheek, 498 U.S. at 201.

Regarding the last subject listed in the preceding paragraph, Defendants proffer the following:

> Mr Banister's testimony may continue with an evaluation and analysis of the manner in which an IRS special agent would evaluate the specific circumstances pertaining to [Defendants] during the years under investigation/prosecution and how an IRS-CID special agent would determine whether [Defendants'] circumstances would or would not result in a conclusion that [Defendants] had indeed violated federal tax laws.  In this regard, Mr. Banister's testimony may include, but is not limited to, an analysis of the foundational evidence, events and circumstances necessary in order for an IRS-CID special agent to recommend prosecution for a tax evasion violation, an analysis of the 'elements of the crime' that must be satisfied in order to conclude, for purposes of the investigation and prosecution recommendation, that a tax evasion violation has indeed occurred.  His testimony may also include an analysis as to whether the IRS-CID special agent could have found that [Defendants] committed specific acts of evasion, whether the IRS-CID special agent could have computed an additional tax due and owing and whether the IRS-CID special

agent could have found that [Defendants] acted wilfully in connection with the accusations leveled against them.

[Id. at 6-7]  Defendants fail, however, to link this proffer of testimony to any issue in the case.  The manner of the IRS-CID agent's investigation in this case is not relevant to help the jury determine "1) the existence of a substantial tax liability, 2) willfulness, and 3) an affirmative act constituting evasion or attempted evasion."  Mounkes, 204 F.3d at 1028; See Fed. R. Evid. 401 ("Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").  Defendants have not demonstrated how the methods of investigation, at this stage, are relevant to the determination of guilt or innocence.  In addition, Mr. Bannister's proposed testimony is comprised largely of legal conclusions, which are not a proper form of expert testimony. See United States v. Bedford, 536 F.3d 1148, 1158 (10th Cir. 2008) ("An expert may not state legal conclusions drawn by applying the law to the facts, but [a]n expert may . . . refer to the law in expressing his or her opinion." (alterations in original) (internal quotation marks and citation omitted)).  Accordingly, this Court exercises its discretion and excludes Mr. Banister's testimony.

**E.     Third-Party Convictions [Doc 146]**

Defendants also argued that this Court should exclude all references by the Government to third-party convictions.  Specifically, Defendants pointed out that the Government's trial brief refers to two individuals, with whom Defendants are associated,

who have been convicted for tax-related offenses.  [Id. at 1]  The Government responded

that the evidence of these convictions is relevant only to the extent that Defendants knew

about the convictions and legal entanglements and yet relied on the advice or writings of

these persons.  [Doc 162 at 1]  At the Call of the Calendar, Defendants withdrew the

*Motion.*

**F.      Trial Hours [Doc 148]**

On June 21, 2010, Sharon Hopkins filed a *Motion To Limit Trial Hours* [Id.].  At

that time, Sharon Hopkins stated that she had recently undergone a total

nephrectomy—removal of a kidney—and that she could not sit without pain for more

than two or three hours.  [Doc 149 at 1]  As a result, Sharon Hopkins requested that the

trial day be limited from 9:00 a.m. to 5:00 p.m., that a 15 or 20 minute break be scheduled

during the morning and the afternoon, and that luncheon be scheduled for one and a

quarter hours.  [Id. at 2]  The Government did not respond to the *Motion*.

This *Motion* was filed anticipating an August 9, 2010 trial date.  The trial was

continued six weeks, until September 21, 2010.  Since the time that the *Motion* was filed,

Sharon Hopkins has reported to her pretrial services officer that she feels "great" and has

also traveled from Carlsbad to Albuquerque in order to visit with her children.  At the

Call of the Calendar, held on September 20, 2010, she indicated that she was in good

health.  She no longer requested these accommodations.  Further, the Court is always

mindful of the participants physical comfort—whether attorney, jury member, or

defendant.  There is no need to schedule special breaks or recesses but instead, the

participants have been informed that they should alert the Court to any needs that may

arise during trial, and those needs will be accommodated.

**F.      Revenue Agent Sandra Villareal [Doc 153]**

Defendants contend that the Government's witness, Revenue Agent Sandra

Villareal, should be prevented from testifying because the Government has not

sufficiently demonstrated her qualifications, reliability, or the relevance of her testimony.

[Id. at 1]  Further, Defendants argue that the expert disclosures fail to satisfy Fed. R.

Crim. P. 16(a)(1)(G).  This Court has already set forth the Daubert and Kumho Tire Co.

standards.

The Government has proffered that Agent Villareal will testify about her audit of

Defendants and about her review of Defendants' records for tax years 2002 through 2007.

[Doc 153-1 at 3]  Defendants contend that the Government has failed "to show that Ms.

Villareal possesses the knowledge, skill, experience, training, or education required to be

considered an expert for the purposes of this trial."  [Doc 154 at 11]  Agent Villareal has a

B.A. in accounting from Eastern New Mexico University and has been employed as a

revenue agent for the IRS since 1987—for 23 years.  She has been posted in Roswell,

New Mexico since 1991.  According to her resume, in her position as revenue agent she is

"[r]esponsible for the interpretation and application of the Internal Revenue Code as it

pertains to individuals, corporations, and partnerships."  [Doc 153-2 at 1]  Her "[d]uties

include preparation of audit workpapers to support technical and factual conclusions,

analysis of financial documentations, and preparation of monthly administrative reports.

[Id.]  The Court finds, therefore, that 23 years of experience as a revenue agent provides sufficient experience and training for Agent Villareal to testify as an expert regarding the calculation of tax due and owing.

Although Defendants purport to challenge the reliability and relevance of Agent Villareal's testimony based on Daubert, [see doc 154 at 1] the remainder of the legal arguments in their *Motion* pertain to the alleged inadequacies of the Government's Rule 16 disclosure.  [See id. at 10 ("In this case involving multiple complex tax counts, the proffered summary of and basis for Ms. Villareal's opinion does not meet the required standards of Federal Rules of Criminal Procedure 16(a)(1)(G) and thus cannot be considered reliable or relevant under Daubert.")]  Rule 16(a)(1)(G) states the following:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

The Court has already found that the Government has adequately disclosed Ms. Villareal's qualifications.  Accordingly, the Court turns to Ms. Villareal's opinions and the "bases and reasons for those opinions."  Id.

On three occasions, the Government has provided notice of Ms. Villareal's intended testimony:  by a trial brief filed December 11, 2009 [Doc 79], by a trial brief filed May 3, 2010 [Doc 115], and by letter to Defendants' counsel dated May 18, 2010 [Doc 153-1].  In the December 11, 2009 trial brief, the Government stated that Ms.

Villareal will testify as a "summary witness" about her experience auditing Defendants in

the 1990s and about "the couple's tax due and owing for tax years 2002 through 2007."

[Doc 79 at 5]  Also in the December trial brief, the Government explains that Agent

Villareal has reviewed "Defendant Mark Hopkins's paychecks from the Schumacher

Group, Sharon Hopkins's Forms K-1 from [My Favorite New Mexico Foods], and the

summaries of deductible expenses identified by the Special Agent (*i.e.* Schedule A

deductible expenses, such as charitable, home interest, property tax deductions, and

Schedule C business expenses)."  [Id. at 14]  In addition, Agent Villareal will rely on the

live testimony that she hears in the court room.  [Id.]  Finally, the Government explains

that Agent Villareal

> will be testifying as both a fact witness and a summary witness.  In her
> capacity as a fact witness, she will testify that she computed the couple's
> tax due and owing for tax years 1996, 1997, 1999, 2000, and 2001 during a
> series of audits.  Of significance, she will testify that she advised
> Defendants that their positions about the income tax code were frivolous.
>
> . . . .
>
> [Agent] Villareal calculated the income figures as to Defendants.
> Specifically, she will testify that, based on the business records of the
> Schumacher Group, bank records introduced at trial, tax returns for [My
> Favorite New Mexico Foods], and schedule of deductible expenses, she will
> testify that [D]efendants have a tax due and owing for tax years 2002
> through 2007].

[Id. at 18-19]  The May trial brief and the May letter set forth substantially the same

information as the December trial brief.  [See Doc 115; Doc 153-1]  Defendants maintain

that these proffers do not "sufficiently summarize and give the basis for Ms. Villareal's

testimony" because "her actually *[sic]* testimony is not sufficiently described or summarized."  [Doc 154 at 10-11]  Ultimately, Defendants argue that the Government's disclosures fail "to give adequate notice of Ms. Villareal's opinion."  [Id. at 12]

The Government's obligation under Rule 16 is to provide a statement of the expert's intended testimony.  See United States v. Brown, 592 F.3d 1088, 1091 (10th Cir. 2009).  The Government is not required "specifically describe the expert's methodology." Id.  Our Circuit has explained the operation of Rule 16 as follows:

> The provisions of Rule 16 are intended to meet [the need for counsel to learn that an expert is expected to testify] by first, requiring notice of the expert's qualifications which in turn will permit the requesting party to determine whether in fact the witness is an expert within the definition of Federal Rule of Evidence 702.  Next, the requesting party is entitled to a summary of the expected testimony. And finally, and perhaps most important, the requesting party is to be provided with a summary of the bases of the expert's opinion.

United States v. Nacchio, 555 F.3d 1234, 1237 (10th Cir. 2009) (alteration in original) (internal quotation marks and citation omitted).

Defendants appear to argue that the Government is required to explain how Agent Villareal reached her opinions.  For example, Defendant asserts that "the Government states in the Disclosure that Shalom Enterprises is not exempt, however, the Disclosure fails to summarize or detail why Shalom Enterprises is not exempt."  [Doc 154 at 11] The letter and the trial briefs, however, stated that Agent Villareal would testify that Defendants have tax due and owing for the indicted time periods, and the Government has provided, in detail, the numerous documents that form the basis for Agent Villareal's

opinion.  The documents provide the data, to which Agent Villareal will apply her

knowledge and training in order to form her opinion.  See Bedford, 536 F.3d at 1158

("[E]xpert testimony by an IRS agent which expresses an opinion as to the proper tax

consequences of a transaction is admissible evidence, so long as the expert does not

directly embrace the ultimate question of whether [the defendants] did in fact intend to

evade income taxes." (second alteration in original) (internal quotation marks and citation

omitted)).  There is no requirement under Rule 16 that the Government "specifically

describe the expert's methodology."  Brown, 592 F.3d at 1091.  Based on the

Government's disclosures, the Court finds that "[t]he government substantially complied

with Rule 16."  Id. (explaining that "the summary stated that [the expert] would testify

that the latent fingerprint on the job application was [the defendant's], as did her own

report" and that therefore, "[t]he government substantially complied with Rule 16.).

         Based on review of Agent Villareal's qualifications and proposed testimony, the

Court finds that she is qualified and that her experience and training as a revenue agent

establish that her testimony on the subject of tax due and owing is reliable and relevant.

**G.      Motion To Strike Surplusage [Doc 158]**

         Defendants have also filed a motion to strike "surplusage" from the Indictment

because the targeted language "contains (1) insinuations of unnecessary facts; (2)

descriptive language that is irrelevant and prejudicial; (3) and prejudicially inflammatory

matter."  [Doc 159 at 13]  According to Fed. R. Crim. P. 7(d), "[u]pon the defendant's

motion, the court may strike surplusage from the indictment or information."  Our Circuit

has held that "[a]cting in its discretion, a district court may strike as surplusage allegations not relevant to the charge at issue and inflammatory and prejudicial to the defendant." United States v. Schuler, 458 F.3d 1148, 1153 (10th Cir. 2006) (internal quotation marks and citation omitted). Defendants present each contested paragraph of the Indictment and provide an argument for why the information contained therein is irrelevant and prejudicial. First, however, the Court will again outline the elements of the crimes charged, in order to determine whether the challenged language in the Indictment is indeed surplusage.

As has been noted, Defendants are charged with one count of conspiracy to defraud the United States for the purpose of impeding the lawful functions of the IRS in the ascertainment, computation, assessment, and collection of revenue and seven counts of willful tax evasion. [Doc 1 at 3, 8-9] In order to establish a conspiracy to defraud, the Government must prove the following: "(1) the defendant entered into an agreement; (2) the agreement involved a violation of the law; (3) one of the members of the conspiracy committed an overt act; (4) the overt act was in furtherance of the conspiracy's object; and (5) the defendant wilfully entered the conspiracy." Thompson, 518 F.3d at 853 (internal quotation marks and citation omitted). Further, in order to demonstrate that Defendants evaded the payment of income tax due and owing, the Government must show "(1) a substantial tax liability, (2) willfulness, and (3) an affirmative act constituting evasion or attempted evasion." Id. at 850 (internal quotation marks and citation omitted). Our Circuit has noted that

> In proving tax evasion, the government's evidence is ordinarily circumstantial, since direct proof is often unavailable. Circumstantial evidence in this context may consist of, among other things, a failure to report a substantial amount of income, a consistent pattern of underreporting large amounts of income, the spending of large amounts of cash that cannot be reconciled with the amount of reported income, or any conduct, the likely effect of which would be to mislead or to conceal.

Id. at 850-51 (internal quotation marks and citation omitted).

Turning to the challenged portions of the Indictment, Defendants begin with paragraph three, which states: "From at least May 13, 2005, SHARON J. HOPKINS was a fifty percent owner of My Favorite New Mexico Foods, LLC, which manufactured and sold traditional New Mexico Foods, including red and green chile." [Doc 1 at 1; Doc 159 at 8] Defendants contend that this information is not necessary to prove any indicted offense and further, is prejudicial surplusage. The Government responds that this information is relevant in two ways. First, because the business losses from the company flow through Sharon Hopkins's personal tax returns, and second, because she signed a "U.S. Partnership Declaration and Signature for Electronic Filing" document in 2006. [Doc 163 at 2] The existence of the business is necessary to provide a complete picture of the flow of the money. Further, Sharon Hopkins's actions regarding the business demonstrate that she understood her tax obligations with respect to the business—such evidence is relevant to whether she willfully evaded personal income taxes returns or whether she failed to pay those taxes in good faith. Finally, Defendants have not explained the prejudice that would result from revealing the fact that Sharon Hopkins

owned a specialty food business.

Next, Defendants argue that paragraph four is also prejudicial and inflammatory. [Doc 159 at 9] Paragraph four states that "MARK E. HOPKINS and SHARON J. HOPKINS have failed to file personal federal tax returns since tax year 1997." [Doc 1 at 2] Defendants argue that because they are not charged with willful failure to file, but instead with willful evasion, the fact that they have not filed a return "is not necessary information to prove any claimed indicted offense." [Doc 159 at 9] Although it is well established that an affirmative act of evasion requires that the Government prove "more than the passive failure to file a tax return," United States v. Meek, 998 F.2d 776, 779 (10th Cir. 1993), it does not follow that the fact that Defendants did not file returns during the indicted period is irrelevant. The test for relevance is whether the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The failure to file a tax return for a period of more than a decade does not conclusively demonstrate that Defendants willfully evaded payment of taxes, but the failure to file returns certainly makes it more probable that they acted willfully.

In paragraph five of the Indictment, the Government lists a number of entities, including trusts and corporations, and alleges that those entities were created to conceal Defendants' assets. [Doc 1 at 2-3] Defendants contend that the Government is attempting to veil legitimate corporations "in a sinister cloak," and they maintain that this information is not necessary "to prove any claimed indicted offense." [Doc 259 at 9]

The Government's position is that the corporations and trusts are not legitimate, but instead "nominees that Defendants had been advised were not lawfully used for tax avoidance purposes." [Doc 163 at 3]  The facts in paragraph five are offered to establish "affirmative act[s] constituting evasion or attempted evasion"—the Government alleges that Defendants put their money into these entities in order to avoid paying taxes.  Thompson, 518 F.3d at 850 (internal quotation marks and citation omitted).  Thus, the existence of the corporations and trusts is relevant to prove an element of the charged crimes and will not be stricken.  Defendants also object to the Government's use of the term "purported trust" and "purported trustees" in paragraph five.  [Doc 159 at 9-10]  For the same reasons that the existence of the corporations and the trusts is relevant, the Government's position that the trust and the trustees are fraudulent or nominal is also relevant.

Turning to paragraph six, the Indictment states that "V.A., B.I., D.P., and S.S. are initials of individuals who were or are relatives or friends of MARK E. HOPKINS and SHARON J. HOPKINS, whose names have been identified for the grand jury." [Doc 1 at 3]  In the previous paragraph of the Indictment, these persons were identified as "purported trustees." [Id. at 2-3]  Defendants argue that this paragraph should be stricken because these persons are not coconspirators and "their identity and relationship, if any with the Hopkins defendants, is not necessary information to prove any claimed indicted offense." [Doc 159 at 10]  The Government responds that "the fact that these individuals are close friends and immediate family evidences the lack of independence by these

trustees." [Doc 163 at 3]  It is again the Government's position that these trusts are not

legitimate and that the funds are entirely in the control of Defendants—and not the

trustees—thereby establishing that the trusts are sham entities.  Thus, the identities of and

relationship between the trustees and Defendants is relevant to the "affirmative act"

element of the tax evasion charges.

Defendants next challenge the use of the word "elsewhere" in paragraph nine.

[Doc 159 at 10]  Paragraph nine states the following:

> Beginning in or about 1996, the exact date being unknown to the Grand
> Jury, and continuing thereafter up to and including the date of this
> indictment, in the District of New Mexico, in Eddy and Chaves Counties,
> and *elsewhere*, the defendants, MARK E. HOPKINS and SHARON J.
> HOPKINS, with others known and unknown to the Grand Jury, did
> knowingly and unlawfully combine, conspire, confederate, agree together
> and with each other to defraud the United States for the purpose of
> impeding, impairing, obstructing, and defeating the lawful governmental
> functions of the IRS in the ascertainment, computation, assessment, and
> collection of the revenue: to wit, income taxes.

[Doc 1 at 3 (emphasis added)]  Defendants argue that they do not know where

"elsewhere" is and neither does the Government, and as a result, Defendants maintain that

"'[e]lsewhere is not necessary information to prove any claimed indicted offense, and

therefore should not be mentioned in the indictment." [Doc 159 at 10]  The Government

avers that Sharon Hopkins "committed acts of evasion in Nevada," [Doc 163 at 3] and it

further appears that one of the corporations is an Oregon Corporation. [Doc 159 at 9]

The Government argues that it is not required to "identify every place where overt acts in

furtherance of the conspiracy occurred." [Doc 163 at 3]  Indeed, "[a]n indictment need

not go further and allege in detail the factual proof that will be relied upon to support the charges." United States v. Dunn, 841 F.2d 1026, 1029 (10th Cir. 1988) (internal quotation marks and citation omitted).  Thus, to incorporate acts committed by Defendants that were not in either Eddy or Chaves Counties, the Government has properly widened the scope of the Indictment.

In paragraphs 10, 11, and 12, the Government uses the term "nominee."  [Doc 1 at 4]  For example, the Indictment alleges that "[i]t was a part of the conspiracy for MARK E. HOPKINS to direct his business income to a nominee to conceal his income."  [Id.] Defendants appear to argue that the use of a "nominee" is not necessarily evidence of evasion and that because "[t]he Government does not assert that 'nominee' is an alter ego or fraudulent nominee of the Hopkins defendants," the information is simply unnecessary, prejudicial, and inflammatory surplusage.  [Doc 159 at 11]  The language of the Indictment makes clear that the Government is alleging that the nominees were fraudulent.  In paragraph 10, Mark Hopkins is alleged to have used a nominee to "conceal his income."  [Doc 1 at 4]  In paragraph 11, Mark and Sharon Hopkins are alleged to have transferred funds between bank accounts held in nominee names in order to "further part of the conspiracy."  [Id.]  In paragraph 12, Defendants allegedly titled real property in the names of nominees "to conceal their ownership of the property."  [Id.]  The alleged use of "nominees" is tied directly to the Government's obligation to prove that Defendants took "overt act[s] in furtherance of the conspiracy's object."  Id. at 853.  Accordingly, references to "nominees" will not be stricken from the Indictment.

Turning to paragraph 28, the Indictment alleges the following:

> On or about June 27, 2000, MARK E. HOPKINS and SHARON J.
> HOPKINS signed a signature card for the bank account of Shalom
> Enterprises, account #xxx2375 at Bank of Southwest.  On the signature card
> MARK E. HOPKINS and SHARON J. HOPKINS listed a fictitious EIN
> and stated Shalom Enterprises was exempt from taxation.

[Id. at 6-7]  Defendants object to the use of the word "fictitious" because they contend

that the EIN is valid and "the language . . . will suggest to the jury that the numbers were

bogus, when they were not."  [Doc 159 at 11]  Defendants are free to make this argument,

and the Government is certainly required to prove its allegations, but the allegation of

"fictitious" EINs is not irrelevant to the charges simply because Defendants contend that

the numbers are valid.  If proven, Defendants' use of a fictitious EIN is evidence that they

acted wilfully, which as has been repeatedly stated, is an element of the charged crimes.

In paragraphs 32, 34, 35, and 36, the Government alleges that Defendants took

certain legitimate actions:  filing amendments to the annual report for Shalom Enterprises,

Inc., applying for a credit card in the name of House of Royale, Inc., opening a bank

account in the name of House of Royale, Inc., and filing articles of incorporation for

House of Royale, Inc., with the state of Nevada.  [Doc 1 at 7]  Defendants argue that this

information is "not necessary to prove any indicted offense, and therefore should not be

mentioned in the indictment."  [Doc 159 at 11-12]  Despite this argument, each of these

acts, if proven, are "overt act[s]" that the jury could find furthered the alleged conspiracy

to defraud the United States.  Viewed another way, the jury could find that these were

affirmative acts of evasion—designed to hide income.  See Meek, 998 F.2d at 779

(stating that an "affirmative act" requires "a positive act of commission designed to mislead or conceal").

Based on this review of Defendants' challenges to the Indictment, the Court denies the *Joint Motion To Strike Surplusage* [Doc 158].

### H.    Motion To Preclude Summary Evidence [Doc 160]

Next, Defendants objected to the admission of summary evidence in two forms:  a series of summary charts and the testimony of two summary witnesses.  This *Motion* was withdrawn on the record at the Call of the  Calendar.

### II.    CONCLUSION

For the reasons stated above and on the record, the Court grants in part and denies in part the *Motions*.  In addition, the Court notes that the following motions were withdrawn by the parties on the record at the September 20, 2010 hearing: the *Government's Motion In Limine To Admit, Subject To A Determination Of Relevance, Domestic Bank Records And Other Business Records* [Doc 130]; *Defendants' Motion In Limine* [Doc 43], Defendants' *Motion In Limine To Preclude Summary Witness Testimony And Evidence* [Doc 160], and *Defendants' Motion In Limine* [Doc 146].

All rulings made are subject to reconsideration in the event unforeseen circumstances should arise at trial.

**IT IS THEREFORE ORDERED** *Government's Motions in Limine* [Doc 42 & Doc 143] are **GRANTED IN PART AND DENIED IN PART**, Defendant Sharon Hopkins's *Motion To Dismiss And Strike Count 2 As It Pertains To Sharon Hopkins* [Doc

140] is **DENIED**, the *Government's Motion In Limine To Exclude The Testimony Of Joseph R. Banister* [Doc 142] is **GRANTED**, Defendant Sharon Hopkins's *Motion To Limit Trial Hours* [Doc 148] is **DENIED**, Defendants' *Joint <u>Daubert</u> Motion/Motion In Limine To Preclude Sandra Villareal As Expert* [Doc 153] is **DENIED**, and Defendants' *Joint Motion To Strike Surplusage* [Doc 158] is **DENIED**.

      **SO ORDERED** this 22nd day of September, 2010, in Albuquerque, New Mexico.


M. CHRISTINA ARMIJO
United States District Judge